IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

IN THE MATTER OF THE SEARCH OF
INFORMATION ASSOCIATED WITH
FACEBOOK ACCOUNT NUMBER
100009006058858 THAT IS STORED AT
PREMISES CONTROLLED BY
FACEBOOK INC.

Case No. __7:21mj124__

**Filed Under Seal**

## AFFIDAVIT IN SUPPORT OF
## AN APPLICATION FOR A SEARCH WARRANT

I, Drew Effing, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1. I make this affidavit in support of an application for a search warrant for information associated with Facebook **ACCOUNT NUMBER 100009006058858** that is stored at premises owned, maintained, controlled, or operated by Facebook Inc. ("Facebook"), a social networking company headquartered in Menlo Park, California. The information to be searched is described in the following paragraphs and in Attachment A. This affidavit is made in support of an application for a search warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A) to require Facebook to disclose to the government records and other information in its possession, pertaining to the subscriber or customer associated with the Account Number.

2. I am a Special Agent with the Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF) and have worked in this capacity since March, 2020. I am currently assigned to the Roanoke Field Office located within the Washington Field Division. As an ATF Special Agent, I have received training and experience regarding investigations involving firearms and narcotics trafficking and the possession of firearms by prohibited

persons. As a result of my training and experience, I have learned methods commonly used by narcotics and firearms traffickers to engage in unlawful activity. I am familiar with evidence that is frequently indicative of narcotics trafficking, unlawful firearms possession and firearms trafficking.

3. The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

4. Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that violations of 18 U.S.C. §§ 922(a)(1), 922(a)(6), and 924(a)(1)(A) have been committed by Christopher Devonte JOHNSON. There is also probable cause to search the information described in Attachment A for evidence of these crimes and contraband or fruits of these crimes, as described in Attachment B.

## PROBABLE CAUSE

### CASE INITIATION

5. Between 2020 and 2021, ATF submitted multiple queries to the Firearms Transaction Center (FTC) of the Virginia State Police, seeking records of firearm transaction approvals for Christopher Devonte JOHNSON based on purchaser background checks. Records received from the FTC in response to these inquiries reflected approximately eighty-one (81) different firearm transaction approvals for JOHNSON between February 10, 2019 and May 12, 2021. Approximately seventy-seven (77) approvals were then linked to transactions from several different Federal Firearms Licensees (FFL).

2

## SUMMARY OF INTELLIGENCE CONCERNING
## FIREARM PURCHASES AND RECOVERIES

6. Based on these reports, ATF multiple sales reports, and ATF firearms trace summaries, ATF obtained Form 4473 firearms transaction reports for JOHNSON'S purchases. According to these reports, JOHNSON purchased approximately one-hundred and seventeen (117) firearms between May 3, 2017, and May 12, 2021.

7. Based on my training and experience, I know that it is common for straw purchasers to purchase multiple firearms of the same make, model, and caliber in a short period of time.

8. According to reports of JOHNSON'S firearm purchases, JOHNSON has purchased a minimum of:

   a. Eleven (11) Taurus, model G2C, 9mm handguns
      i. Three (3) purchased on 03/30/2019 from Doomsday Tactical
      ii. Two (2) purchased on 04/28/2019 from Doomsday Tactical
      iii. Five (5) purchased on 05/04/2019 from SWVA Arms
   b. Nine (9) Phoenix, model HP25 (or HP25 variant), .25 caliber pistols
      i. Two (2) purchased on 08/26/2019 from SWVA Arms
      ii. Two (2) purchased on 09/13/2019 from SWVA Arms
      iii. Three (3) purchased on 09/18/2019 from SWVA Arms
      iv. Two (2) purchased on 10/17/2019 from SWVA Arms
   c. Four (4) Taurus, model Spectrum, .380 caliber pistols
      i. Four (4) purchased on 10/17/2019 from SWVA Arms
   d. Seven (7) Ruger, model LCP, .380 caliber pistols

3

    i. Two (2) purchased on 12/11/2019 from SWVA Arms

    ii. Four (4) purchased on 12/22/2019 from Commonwealth Arms

  e. Eight (8) Glock, model 19 (or 19 variant), 9mm pistols

  f. Three (3) Glock, model 43, 9mm pistols

  g. Two (2) Ruger, model EC9S, 9mm pistols.

    i. Both (2) purchased on 06/22/2018 from SWVA Arms

9. Based on my training and experience, I know that when purchased firearms are later possessed by other individuals and/or recovered by law enforcement in other states, it can be an indicator of straw purchasing and/or firearms trafficking.

10. Six (6) firearms purchased by JOHNSON have been recovered by law enforcement from crime scenes and from individuals suspected of criminal activity. Four (4) of the six firearms were recovered in Brooklyn, New York, one (1) in Greenland, New Hampshire, and one (1) in Roanoke, Virginia:

  a. Glock, model 26, 9mm pistol, SN: BCXZ957 recovered on or about 01/06/2019 in Roanoke, Virginia

  b. Taurus, model G2C, 9mm pistol, SN: TLX60155 recovered on or about 10/08/2019 in Brooklyn, New York

  c. Taurus, model G2C, 9mm pistol, SN: TMB59909 recovered on or about 10/17/2019 in Brooklyn, New York

  d. Taurus, model Spectrum, .380 caliber pistol, SN: 1F031450 recovered on or about 10/22/2020 in Brooklyn, New York

  e. Ruger, model LCP, .380 caliber pistol, SN: 372297931 recovered on or about 06/16/2020 in Greenland, New Hampshire

4

...

    f.    Smith and Wesson, model 642, .38 caliber revolver, SN: DLH9612 recovered on or about 02/03/2021 in Brooklyn, New York[1]

11.    According to SWVA Arms manager Walter Warner, JOHNSON worked as a contractor at SWVA Arms, selling firearms and as an "inventory specialist". JOHNSON'S name appears in the "Transferor/Sellers Name" box on several Form 4473s, to include Form 4473s in which JOHNSON is also listed as the "Transferee/Buyer".

12.    ATF is actively investigating JOHNSON for suspected straw purchasing and engaging in the business of dealing in firearms without a federal firearms license in violation of 18 U.S.C. §§ 922(a)(1), 922(a)(6) and 924(a)(l)(A).

## SUMMARY OF INTELLIGENCE CONCERNING FACEBOOK GROUP CHAT "GUNS, GEAR AND TECH"

13.    I know from my training and experience that individuals engaged in illegal firearms trafficking frequently use text, voice calls, and social media applications such as Facebook to communicate and further their criminal activities.

14.    Specifically, individuals use such electronic applications and social media to coordinate the purchase, sale, transport, and transfer of firearms, and to collect proceeds from illicit sales, maintaining frequent contact with customers and their sources of supply.

15.    In another active ATF investigation, an individual by the name of Sedale YOUNG has been identified as a suspected straw purchaser of firearms and is being investigated for firearms trafficking. During the course of the investigation of YOUNG, a search and seizure warrant for YOUNG'S phone was obtained. The warrant was executed in approximately May, 2020, and the contents of the phone analyzed. Social media data files in

---

[1] This firearm was purchased second hand by JOHNSON from another individual.

5

YOUNG'S phone revealed he communicated using two types of Facebook chats—private messages, which involved correspondence between two accounts, and group chats, which only contained the account names of the participants and the title of the group chat.

16. The content of the private messages reveals that YOUNG was using Facebook chat as a platform to market and sell firearms. For example, in one private message, YOUNG states: "300 for G2" (believed to refer to a $300 Taurus, model G2C) and "I got one .357" (believed to refer to a .357 caliber firearm).

17. Investigators also identified a Facebook group chat on YOUNG'S phone titled "Guns, Gear and Tech," involving YOUNG and approximately 11 other individuals or user accounts. Since it was a group chat, the device extraction did not contain the content of the chat.

18. One of the other user accounts interfacing with YOUNG through the "Guns, Gear and Tech" group chat was identified by investigators in approximately May, 2021, to be JOHNSON. JOHNSON'S suspected Facebook account number (100009006058858) with associated username Chris Johnson interfaces with YOUNG in both private messages as well as the "Guns, Gear and Tech" group chat, which shows the last activity of April 23, 2020.

19. JOHNSON is believed to be associated with phone number (540) 815-9169. This phone number is listed under the contact name "Chris" in YOUNG'S phone data extraction information. In a text message exchange between this phone number and YOUNG, the user of this number states: "Im at my ma dukes 515 Centre Ave. Near the coke factory". JOHNSON'S address, according to Virginia Department of Motor Vehicles, is 515 Centre Ave NW, Apt E, Roanoke, VA 24016.

20. The extraction of YOUNG'S phone reveals that YOUNG and JOHNSON exchanged text messages related to firearms. For example, one such text message from YOUNG to JOHNSON reads: "Any 40s you wanna let go?" Another reads, "You still tryna let go that glock?" These messages are believed to relate to requests for firearms.

21. Given the firearms trafficking investigations into JOHNSON and YOUNG, the electronic communications between JOHNSON and YOUNG concerning firearms, JOHNSON and YOUNG'S participation in the "Guns, Gear and Tech" Facebook chat group, there is probable cause to believe this Facebook chat will contain further evidence of the criminal activity described herein.

## FACEBOOK INC.

22. Facebook owns and operates a free-access social networking website of the same name that can be accessed at http://www.facebook.com. Facebook allows its users to establish accounts with Facebook, and users can then use their accounts to share written news, photographs, videos, and other information with other Facebook users, and sometimes with the general public.

23. Facebook asks users to provide basic contact and personal identifying information to Facebook, either during the registration process or thereafter. This information may include the user's full name, birth date, gender, contact e-mail addresses, Facebook passwords, physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers. Facebook also assigns a user identification number to each account.

24. Facebook users may join one or more groups or networks to connect and interact with other users who are members of the same group or network. Facebook assigns

7

a group identification number to each group. A Facebook user can also connect directly with individual Facebook users by sending each user a "Friend Request." If the recipient of a "Friend Request" accepts the request, then the two users will become "Friends" for purposes of Facebook and can exchange communications or view information about each other. Each Facebook user's account includes a list of that user's "Friends" and a "News Feed," which highlights information about the user's "Friends," such as profile changes, upcoming events, and birthdays.

25. Facebook users can select different levels of privacy for the communications and information associated with their Facebook accounts. By adjusting these privacy settings, a Facebook user can make information available only to himself or herself, to particular Facebook users, or to anyone with access to the Internet, including people who are not Facebook users. A Facebook user can also create "lists" of Facebook friends to facilitate the application of these privacy settings. Facebook accounts also include other account settings that users can adjust to control, for example, the types of notifications they receive from Facebook.

26. Facebook users can create profiles that include photographs, lists of personal interests, and other information. Facebook users can also post "status" updates about their whereabouts and actions, as well as links to videos, photographs, articles, and other items available elsewhere on the Internet. Facebook users can also post information about upcoming "events," such as social occasions, by listing the event's time, location, host, and guest list. In addition, Facebook users can "check in" to particular locations or add their geographic locations to their Facebook posts, thereby revealing their geographic locations at particular dates and times. A particular user's profile page also includes a "Wall" which is a

8

space where the user and his or her "Friends" can post messages, attachments, and links that will typically be visible to anyone who can view the user's profile.

27. Facebook allows users to upload photos and videos, which may include any metadata such as location that the user transmitted when s/he uploaded the photo or video. It also provides users the ability to "tag" (i.e., label) other Facebook users in a photo or video. When a user is tagged in a photo or video, he or she receives a notification of the tag and a link to see the photo or video. For Facebook's purposes, the photos and videos associated with a user's account will include all photos and videos uploaded by that user that have not been deleted, as well as all photos and videos uploaded by any user that have that user tagged in them.

28. Facebook users can exchange private messages on Facebook with other users. Those messages are stored by Facebook unless deleted by the user. Facebook users can also post comments on the Facebook profiles of other users or on their own profiles; such comments are typically associated with a specific posting or item on the profile. In addition, Facebook has a chat feature that allows users to send and receive instant messages through Facebook Messenger. These chat communications are stored in the chat history for the account. Facebook also has Video and Voice Calling features, and although Facebook does not record the calls themselves, it does keep records of the date of each call.

29. If a Facebook user does not want to interact with another user on Facebook, the first user can "block" the second user from seeing his or her account.

30. Facebook has a "like" feature that allows users to give positive feedback or connect to particular pages. Facebook users can "like" Facebook posts or updates, as well as

webpages or content on third-party (i.e., non-Facebook) websites. Facebook users can also become "fans" of particular Facebook pages.

31. Facebook has a search function that enables its users to search Facebook for keywords, usernames, or pages, among other things.

32. Each Facebook account has an activity log, which is a list of the user's posts and other Facebook activities from the inception of the account to the present. The activity log includes stories and photos that the user has been tagged in, as well as connections made through the account, such as "liking" a Facebook page or adding someone as a friend. The activity log is visible to the user but cannot be viewed by people who visit the user's Facebook page.

33. Facebook also has a Marketplace feature, which allows users to post free classified ads. Users can post items for sale, housing, jobs, and other items on the Marketplace.

34. In addition to the applications described above, Facebook also provides its users with access to thousands of other applications ("apps") on the Facebook platform. When a Facebook user accesses or uses one of these applications, an update about that the user's access or use of that application may appear on the user's profile page.

35. Facebook also retains Internet Protocol ("IP") logs for a given user ID or IP address. These logs may contain information about the actions taken by the user ID or IP address on Facebook, including information about the type of action, the date and time of the action, and the user ID and IP address associated with the action. For example, if a user views a Facebook profile, that user's IP log would reflect the fact that the user viewed the profile, and would show when and from what IP address the user did so.

10

36. Social networking providers like Facebook typically retain additional information about their users' accounts, such as information about the length of service (including start date), the types of service utilized, and the means and source of any payments associated with the service (including any credit card or bank account number). In some cases, Facebook users may communicate directly with Facebook about issues relating to their accounts, such as technical problems, billing inquiries, or complaints from other users. Social networking providers like Facebook typically retain records about such communications, including records of contacts between the user and the provider's support services, as well as records of any actions taken by the provider or user as a result of the communications.

37. As explained herein, information stored in connection with a Facebook account may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, a Facebook user's IP log, stored electronic communications, and other data retained by Facebook, can indicate who has used or controlled the Facebook account. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, profile contact information, private messaging logs, status updates, and tagged photos (and the data associated with the foregoing, such as date and time) may be evidence of who used or controlled the Facebook account at a relevant time. Further, Facebook account activity can show how and when the account was accessed or used. For example, as described herein, Facebook logs the Internet Protocol (IP) addresses from which users access their accounts along with the time and date.

11

By determining the physical location associated with the logged IP addresses, investigators can understand the chronological and geographic context of the account access and use relating to the crime under investigation. Such information allows investigators to understand the geographic and chronological context of Facebook access, use, and events relating to the crime under investigation. Additionally, Facebook builds geo-location into some of its services. Geo-location allows, for example, users to "tag" their location in posts and Facebook "friends" to locate each other. This geographic and timeline information may tend to either inculpate or exculpate the Facebook account owner. Last, Facebook account activity may provide relevant insight into the Facebook account owner's state of mind as it relates to the offense under investigation. For example, information on the Facebook account may indicate the owner's motive and intent to commit a crime (e.g., information indicating a plan to commit a crime), or consciousness of guilt (e.g., deleting account information in an effort to conceal evidence from law enforcement).

38. Therefore, the computers of Facebook are likely to contain all the material described above, including stored electronic communications and information concerning subscribers and their use of Facebook, such as account access information, transaction information, and other account information.

### INFORMATION TO BE SEARCHED AND THINGS TO BE SEIZED

39. I anticipate executing this warrant under the Electronic Communications Privacy Act, in particular 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A), by using the warrant to require Facebook to disclose to the government copies of the records and other information (including the content of communications) particularly described in Section I of Attachment B. Upon receipt of the information described in Section I of Attachment B,

12

government-authorized persons will review that information to locate the items described in Section II of Attachment B.

## CONCLUSION

40. Based on the foregoing information, your affiant requests that the Court issue the proposed search warrant.

41. Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant. The government will execute this warrant by serving it on Facebook. Because the warrant will be served on Facebook, who will then compile the requested records at a time convenient to it, reasonable cause exists to permit the execution of the requested warrant at any time in the day or night.

42. This court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711. 18 U.S.C. §§ 2703(a), (b)(1)(A) & (c)(1)(A). Specifically, the court is a district court of the United States that has jurisdiction over the offense being investigated as defined by 18 U.S.C. § 2711(3)(A)(i).

## REQUEST FOR SEALING

43. I further request that the court order that all papers in support of this application, including the affidavit and search warrant, be sealed until further order of the court. These documents discuss an ongoing criminal investigation that is neither public nor known to all of the targets of the investigation. Accordingly, there is good cause to seal these documents because their premature disclosure may seriously jeopardize that investigation.

Respectfully submitted,

*[signature]*

Drew Effing
Special Agent
Bureau of Alcohol Tobacco and Firearms

Subscribed and sworn to me via reliable means on 8/20/21

*Robert S. Ballou*
UNITED STATES MAGISTRATE JUDGE